UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Stuart Strnad, *Plaintiff*, v. Scott Kabel, *et al.*, *Defendants*. | No. 24 CV 6177 <br><br> Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Stuart Strnad brings this shareholder suit derivatively on behalf of a now-dissolved company, Activate Payments, Inc., alleging breach of and conspiracy to breach fiduciary duty, and fraudulent concealment and misrepresentation under Illinois common law. He also individually claims oppression of a minority shareholder under the Illinois Business Corporation Act. Defendants Scott Kabel and ChargeFDIS, Inc. move to dismiss the First Amended Complaint for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). For the reasons below, the motion is denied.

**I.    Background**

The Court takes well-pleaded factual allegations as true for purposes of ruling on the motion to dismiss. *See Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). It also assumes familiarity with the more detailed factual background described in the Court's order on Defendants' first motion to dismiss, *Strnad v. Kabel*, 2024 WL 4802565 (N.D. Ill. Nov. 15, 2024). The amended complaint sets forth identical factual allegations. [*Compare* Dkt. 1, ¶¶ 1–46 *with* Dkt. 28, ¶¶ 1–46.]

This action centers on Plaintiff Stuart Strnad's business relationship with Defendants Scott Kabel, ChargeFDIS, Inc. ("ChargeFDIS"), and Activate Payments, Inc. ("Activate Payments"). In 2019, Strnad and Kabel formed Activate Payments to provide electronic payment processing services in the cannabis industry. [Dkt. 28, ¶¶ 1–17.] Activate Payments was incorporated in Illinois. [*Id.* at ¶ 3.] Strnad and Kabel were the sole shareholders, each holding 50% of the company. Kabel was also president of Activate Payments, while Strnad was not an officer. [*Id.* at ¶ 17.]

Between 2019 and 2020, Activate Payments pursued business with Cresco, a cannabis company with which Strnad had preexisting connections through his employer, GenCanna. Kabel led discussions as the face of Activate Payments to avoid confusion due to Strnad's separate relationship with Cresco. [*Id.* at ¶¶ 18–32.] After Strnad repeatedly requested updates on the status of negotiations, Kabel eventually represented that the deal with Cresco was lost and recommended they dissolve Activate Payments. Strnad agreed, and Kabel filed paperwork to dissolve the company in November 2020. [*Id.* at ¶¶ 33–38.]

In 2024, Strnad discovered that Kabel and his own company, ChargeFDIS, had filed an "Application to Adopt an Assumed Corporate Name" on behalf of ChargeFDIS to use the name "Activate Payment Services" without Strnad's knowledge. Kabel or ChargeFDIS also entered an agreement with a payment processor to be able to provide a solution to Cresco, and sometime after October 14, 2019, entered an agreement with Cresco to provide the payment processing solution. Kabel represented to Strnad that he'd made millions of dollars from his work with Cresco

2

and other dispensaries, whose business he acquired because of the Cresco deal. [*Id.* at ¶¶ 39–46.]

Strnad filed suit in July 2024, individually and derivatively on behalf of Activate Payments, against Kabel and ChargeFDIS to recover the sum of lost business opportunities allegedly owed to Activate Payments and Strnad as its shareholder. Strnad alleged breach of and conspiracy to breach fiduciary duty, fraudulent concealment, and fraudulent misrepresentation. In ruling on the first motion to dismiss, the Court dismissed with prejudice all claims brought in Strnad's individual capacity on shareholder standing grounds. It also dismissed Strnad's derivative claims without prejudice for failure to comply with Rule 23.1, but held that those derivative claims otherwise met Rule 12(b)(6)'s pleading standard. Strnad's First Amended Complaint is identical to the original, except that it (1) excludes individual claims; (2) complies with Rule 23.1, [*see* Dkt. 28, ¶ 50]; and (3) adds a fifth claim for oppression of a minority shareholder under the Illinois Business Corporation Act, 850 ILCS § 5/12.56 *et seq*.

Defendants now seek to dismiss the case for lack of subject-matter jurisdiction under Rule 12(b)(1). They argue that Activate Payments must be realigned as a plaintiff in the case because there is no actual controversy between the company and Strnad. This would eliminate diversity between the parties and, consequently, the Court's jurisdiction under 28 U.S.C. § 1332. In light of this jurisdictional challenge, the Court stayed discovery while resolving Defendants' potentially dispositive motion. [Dkt. 62.]

3

## II. Legal Standard

A motion to dismiss pursuant to Rule 12(b)(1) challenges the Court's subject-matter jurisdiction, which the Court has an ongoing obligation to assure is present. *Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022) ("[R]evisiting [jurisdictional] matters is almost always on the table."). A 12(b)(1) challenge can be mounted as a facial or factual attack on the plaintiff's allegations. The former tests whether the allegations, taken as true, support subject-matter jurisdiction, while the latter contests the existence of jurisdictional facts underlying the allegations. *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). In the case of a facial attack, the court must accept well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor, similar to a 12(b)(6) motion. *Id.*; *Choice v. Kohn Law Firm, S.C.*, 77 4th 636, 638 (7th Cir. 2023). However, surviving a Rule 12(b)(1) challenge is more difficult than surviving a 12(b)(6) challenge because, once questioned, the plaintiff bears the burden of establishing that jurisdictional requirements have been met. *Ware v. Best Buy Stores, L.P.*, 6 F.4th 726, 731 (7th Cir. 2021).

## III. Analysis

Because this case arises under state and common law, the Court only has jurisdiction if every plaintiff is diverse from every defendant, and the matter in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a). It's undisputed that the amount in controversy exceeds the statutory minimum, [Dkt. 1, ¶ 46 (alleging damages of at least $1 million)], and the parties are completely diverse as currently aligned: Strnad is domiciled in California, while defendant Kabel is domiciled in Illinois, and defendants ChargeFDIS and Activate Payments (now

4

dissolved) are/were incorporated in and have/had their principal places of business in Illinois. [*Id.* at ¶¶ 2–5.]

Kabel and ChargeFDIS challenge the Court's jurisdiction, arguing that Activate Payments must be aligned as a plaintiff because there is no actual controversy between Strnad and Activate Payments. This conclusion would destroy the Court's sole basis for jurisdiction and require dismissal. [Dkt. 52 at 3.]

In a derivative shareholder action, the corporation is initially aligned as a defendant because it is necessary to the action. *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522–23 (1947). The named shareholder is a nominal plaintiff who acts on behalf of a corporation that is "disabled from protecting itself." *Id.* at 523. But "the substantive claim belongs to the corporation." *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 219 (2024). In determining whether diversity jurisdiction exists, a court may realign the parties based upon their actual interests in the litigation, regardless of how the plaintiff styles the complaint. *Koster*, 330 U.S. at 523; *Am. Motorists Ins. Co. v. Trane Co.*, 657 F.2d 146, 149 (7th Cir. 1981). Given the corporation's real interest in the litigation, it is typically realigned as a plaintiff. *Koster*, 330 U.S. at 523.

A paradigmatic exception to realignment exists when the corporation is actively antagonistic to the shareholder plaintiff. *Smith v. Sperling*, 354 U.S. 91, 95–97 (1957). Antagonism exists when "management is aligned against the stockholder and defends a course of conduct which he attacks," *id.* at 95, or when the corporation's management "is definitely and distinctly" opposed to the derivative action regardless

of the reason. *Swanson v. Traer,* 354 U.S. 114, 116 (1957); *Doctor v. Harrington*, 196 U.S. 579, 587 (1905) ("The ultimate interest of the corporation made defendant may be the same as that of the stockholder made plaintiff, but the corporation may be under a control antagonistic to him, and made to act in a way detrimental to his rights."). For example, where management "refuses to take action to undo a business transaction or whenever . . . it so solidly approves [of the transaction] that any demand to rescind would be futile," a court should find antagonism. *Smith,* 354 U.S. at 97. Courts determine antagonism from the face of the pleadings and the nature of the controversy. *Id.* at 96. "However, the facts which form the basis for realignment must have been in existence at the time the action was commenced." *Am. Motorists Ins. Co.*, 657 F.2d at 149; *see also Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 571 (2004) ("We have adhered to the time-of-filing rule regardless of the costs it imposes.").

Antagonism in a derivative suit is most clearly illustrated where a minority shareholder cannot obtain a desired action from an active corporation's directors. If management opposes the minority shareholder, the corporation will necessarily be definitively hostile by virtue of the power imbalance between the minority and controlling members. *See Swanson*, 354 U.S. at 116–17 (describing typical derivative shareholder lawsuits); *Beck v. Dobrowski,* 559 F.3d 680, 687 (7th Cir. 2009) ("A corporation is controlled by its management, and when the management opposes the derivative suit the corporation is treated as a defendant rather than as a plaintiff for purposes of determining whether there is diversity jurisdiction.").

A more nuanced analysis is needed when a corporation's management is "deadlocked," perhaps due to an even shareholder split or lack of voting quorum. While the Seventh Circuit has not explored this scenario, other courts generally decline to find antagonism when the corporation is deadlocked because it cannot actively support—or be actively hostile to—either side of the derivative action. *See, e.g.*, *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1237 (9th Cir. 2008) ("[C]ourts have generally not found antagonism where the corporation is structurally incapable of acting to bring suit against its officers and directors . . . ."); *Duffey v. Wheeler,* 820 F.2d 1161, 1163 (11th Cir. 1987) ("Mere inaction, or inability to act on the part of the corporation, because of a deadlock between those who control the corporation has not been found to be the equivalent of active antagonism.").

However, some courts have found antagonism in an otherwise deadlocked relationship when the defendant is alleged to have established control over or dominated the corporation, as through fraud or malfeasance. *See, e.g.*, *Gabriel v. Preble*, 396 F.3d 10, 16 (1st Cir. 2005) (finding antagonism despite shareholders' fifty percent share split because management was "firmly in the opposition camp"); *Ono v. Itoyama*, 884 F. Supp. 892, 900–01 (D.N.J. 1995) (finding antagonism where plaintiff alleged that co-equal shareholder dominated corporation through fraud and extortion), *aff'd sub nom. Keiko Ono v. Itoyama*, 79 F.3d 1138 (3d Cir. 1996); *Qatalyst Inc. v. Pipes.AI, LLC*, 2025 WL 917511, at *6–7 (M.D. Fla. Mar. 26, 2025) (finding antagonism despite shareholders' fifty percent share split because defendant controlled company through co-conspiratorial and tortious misconduct); *Ohrstrom v.*

*P.B. Ohrstrom & Sons, Inc.*, 2018 WL 3545451, at *4 (N.D. Ill. July 24, 2018) (finding antagonism despite corporate deadlock where defendant allegedly controlled day-to-day operations and rejected demand to pursue derivative suit); *see also Smith*, 354 U.S. at 95 ("There will, of course, be antagonism between the stockholder and the management where the dominant officers and directors are guilty of fraud or misdeeds.").

Here, Strnad alleges that he and Kabel incorporated Activate Payments as co-equal shareholders with Kabel serving as president and sole officer. [Dkt. 28, ¶ 17; Dkt. 57 at 5.] He also alleges that Kabel, as a fifty percent shareholder and the president, was "therefore in control of Activate Payments," and "would not authorize or bring action on behalf of Activate Payments against himself and ChargeFDIS" if asked. [*Id.* at ¶¶ 49, 51.] The substance of the complaint alleges how Kabel acted as the face of Activate Payments, led its business negotiations, and effectively used his forward role to fraudulently misrepresent that Activate Payments' business opportunities had failed so that Strnad would agree to dissolve the company. Based on these pleadings, Strnad argues that Activate Payments should be aligned as a defendant because Kabel effectively controlled it through his role as sole officer and fraudulent conduct, through which he prompted the dissolution of Activate Payments to usurp its business opportunities. [Dkt. 57 at 5–8.]

These allegations and the nature of the controversy sufficiently demonstrate antagonism for jurisdictional purposes, and Defendants' arguments to the contrary are unpersuasive. First, Defendants argue that Activate Payments is deadlocked

regardless of the corporate structure described in the complaint because it had already been dissolved when Strnad initiated this suit, preventing it from taking a position on the litigation. [Dkt. 52 at 11.] Defendants don't cite any case law supporting this position. It also appears incompatible with Illinois' corporate survival statute, 850 ILCS § 5/12.80, which governs Strnad's derivative claims. *Strnad*, 2024 WL 4802565, at *5 n.3. This provision preserves the existence of an Illinois company for five years after dissolution so it can settle its corporate affairs. During this period, the corporation may still sue or be sued in its corporate name. *Id.* Additionally, dissolution doesn't "[e]ffect any change in the by-laws of the corporation or otherwise affect the regulation of the affairs of the corporation except that all action shall be directed to winding up the business and affairs of the corporation." 850 ILCS § 5/12.30(c)(3).

Since the corporation can engage in legal action, and its management structure is still relevant (at least for some purposes), it follows that it can still be considered hostile. *See In re Segno Commc'ns, Inc.*, 264 B.R. 501, 508 (Bankr. N.D. Ill. 2001) ("Upon dissolution of a corporation, no matter how the dissolution may be effected, the corporation is regarded as still existing for the purpose of settling up its affairs." (quoting *Treager v. Totsch et al,* 53 N.E.2d 719 (Ill. App. Ct. 1944))). Strnad filed this suit within the survival period, so the Court will consider the state of Activate Payments as contemplated by the corporate survival statute: technically dissolved but functionally intact.

Defendants also argue that Strnad didn't sufficiently allege that Kabel controlled Activate Payments because he didn't plead details about governing documents or state that either shareholder could break a deadlock. [Dkt. 52 at 5; Dkt. 58 at 5.] While Strnad didn't plead these specific details, he did allege that Kabel controlled Activate Payments through his position as sole officer and director of the company. It's also apparent from the complaint that Kabel was the primary individual handling Activate Payments' business dealings. He and Strnad agreed that Kabel would take the lead in business dealings with Cresco to avoid confusion that might be created by Strnad's separate relationship with it through GenCanna. Kabel thus controlled the negotiations and access to information about them, which he abused to defraud Strnad. [Dkt. 28, ¶¶ 17–18, 32, 48–49; Dkt. 57 at 5]. Since Kabel challenges the sufficiency of the pleadings and not their veracity, the Court takes Strnad's well-pled allegations as true. *Bazile*, 983 F.3d at 279.

Defendants' characterization of Strnad's legal positions is also inaccurate. They claim that, contrary to Strnad's position, neither (1) a fraud claim, nor (2) allegations that party is an officer of or controls a company, independently creates antagonism. [Dkt. 58 at 4–5.] But Strnad's argument is not that either factor generates antagonism alone, but that they do so in combination. [Dkt. 57 at 4.] Here, Kabel's position of superior control, as well as the domination he achieved through the alleged fraud, together make Activate Payments hostile.

Ample case law supports this position. *Smith* itself states that antagonism exists "between the stockholder and the management where the dominant officers

and directors are guilty of fraud or misdeeds." 354 U.S. at 95. *Smith* didn't say control can only be assessed through a formal corporate structure. Instead, it suggested a "practical" approach. *Id.* at 97. Consequently, it would be too formalistic to conclude that a corporation is deadlocked solely by an even share split when the allegations suggest domination through other means. *Smith* also cautioned courts not to delve into the merits of a fraud claim on a 12(b)(1) motion and instead look to the pleadings and nature of the controversy. *Id.* at 96. Some courts have accordingly found allegations of fraud indicative of hostility. *See, e.g., BI3, Inc. v. Hamor*, 2011 WL 5023394, at *11 (N.D. Ill. Oct. 20, 2011); *Miller v. Up In Smoke, Inc.,* 738 F. Supp. 2d 878, 882 (N.D. Ind. 2010) ("Antagonism may be drawn from allegations of fraud, breach of trust, or illegality." (citing *Smith*, 354 U.S. at 96)). In combination then, it's reasonable to infer that an officer or director may, through fraud or malfeasance, gain effective control over a corporation regardless of the structure that exists on paper. Once in "antagonistic hands," the corporation is properly considered hostile to the noncontrolling shareholder's interests and should be aligned as a defendant. *Koster*, 330 U.S. at 523.

Nearly all of Defendants' opposing precedent is distinguishable because each case involved a formally deadlocked corporation but lacked allegations that an individual defendant controlled the corporation through fraud or otherwise. *See Duffey*, 820 F.2d (no antagonism where plaintiff alleged futility due to deadlock but did not allege defendant controlled); *Liddy v. Urbanek*, 707 F.2d 1222 (11th Cir. 1983) (similar); *Netwolves Corp. v. Sullivan*, 2001 WL 492463 (S.D.N.Y. May 9, 2001)

11

(similar); *Cohen v. Heussinger*, 1994 WL 240378 (S.D.N.Y. May 26, 1994) (similar); *see also Motameni v. Adams*, 2021 WL 5281035 (D. Or. Nov. 8. 2021) (no antagonism where plaintiff controlled the corporation); *Gibson v. BoPar Dock Co. Corp.*, 780 F. Supp. 371 (W.D. Va. 1991) (no antagonism where plaintiff could take control of corporation).

*Grgurev v. Licul* is Defendants' only case clearly to the contrary. 229 F. Supp. 3d 267 (S.D.N.Y. 2017). There, the plaintiffs and defendants each held 50% of the voting power and shares of two closely held corporations that each owned a restaurant. One defendant was also president of one of the corporations and oversaw the day-to-day operations of the restaurants owned by both. *Id.* at 274–75. Plaintiffs alleged that the defendants breached their fiduciary duties by, among other things, misappropriating funds to benefit unrelated companies that defendants owned. *Id.* at 278–79. The court held that there was no antagonism because only half of the shareholders would vote to initiate litigation. *Id.* at 282. Despite its similarities, *Grgurev* is distinguishable in that the court didn't discuss the relative operational control of the parties and it's not clear whether plaintiffs raised this argument. If they had, the court's approach would nevertheless appear overly formalistic because it only considered the relative voting power of the shareholders.

*Ono* illustrates the more practical approach endorsed by *Smith* and adopted by this Court. In that case, the plaintiff (Ono) brought derivative claims of fraud and breach of fiduciary duty on behalf of a corporation (Altesse) that she and the defendant (Itoyama) co-owned, and were the sole directors and officers of. The

12

complaint described how Itoyama pressured Ono to abandon Altesse's current business and invest in a business he owned. Once Ono acquiesced, Altesse became financially dependent on Itoyama's business, and Itoyama continued to dominate Altesse through fraud and extortion. *Id.* at 893–94. To maintain diversity, Ono argued that there could be no antagonism between herself and the corporation because she and the defendant were coequal shareholders, directors, and management. *Id.* at 900 (citing *Duffey*, 820 F.2d at 1163). The court rejected "a hard and fast rule requiring corporations to be aligned as plaintiffs in all derivative actions brought by coequal shareholders against coequal shareholders" because it would "fail[ ] to account for the nature of the dispute as required by [*Smith*]." *Id.* Instead, the court credited the complaint, which alleged that Itoyama gained control of Altesse through fraud and malfeasance, and aligned Altesse as a defendant. *See also Est. of Ruffu ex rel. Jensen Beach Marine Ctr., Inc. v. Collier*, 2008 WL 801274 (D.N.J. Mar. 20, 2008) (finding antagonism despite deadlock where plaintiff alleged that defendant was the dominant officer and used his position to defraud the company).

In line with *Ono*, Strnad alleges that Kabel used his dominant position as the sole officer and face of Activate Payments to take control of the company through fraud. *Ono* admittedly concerned more prolonged and extreme domination, but the legal principal demonstrated in each is the same. Consequently, the Court finds that Activate Payments is properly aligned as a defendant in this case. *See also Ruffu*, 2008 WL 801274, at *4 (corporation aligned as defendant in part because, as an inactive entity, it couldn't benefit from any judgment).

13

## IV. Conclusion

For the reasons above, the parties remain diverse and the motion to dismiss for lack of subject-matter jurisdiction [Dkt. 52] is denied. The case may proceed, and discovery may resume. [*See* Dkt. 62.]

Enter: 24-cv-6177
Date: May 20, 2025

_____
Lindsay C. Jenkins

14